We have three cases for oral argument this morning. We received the briefs on all the cases and reviewed them and we're ready for arguments. The first case is Apotex, Inc. v. UCB, Inc. Counsel? Good morning, Your Honors. Robert Breisblatt on behalf of Apotex, Inc. and Apotex Court. Because there were so many issues that the judge's opinion raised, I'm going to rely on the arguments we made in our briefs, but I would like to touch on four items to begin with that I think show that the court's opinion was simply wrong. Why don't you start with the experiments, Mr. Breisblatt? Yes, Your Honor. We're talking about the experiments that were done by Apotex in March of 2001 and April of 2001. The first is, remember, the Apotex priority date was 2000. The patent with its specifications and Dr. Sherman's invention was— These four examples, according to demonstrate the claim process, they're all written in the past tense, was allowed, reacted, contained, all passed. The manual specifically says paper examples should not be represented as work actually done. It says, to make that clear, paper examples should not be described using the past tense. Let me get past that. When Dr. Sherman, and he testified, and he's never denied it, when he wrote that patent application for Canada in 2000, he based it on the work he did on Quinnapril, and he was not aware that he could not write the claims the way he wrote it. Wait a second. In the beginning of your brief, you say he's done something like, he has created or directed thousands of formulations on hundreds of marketed drug products, and he wasn't aware of that? Correct. Isn't that normal scientific method that you don't represent as an experiment, something you haven't done and tested? When Dr. Sherman wrote those examples in 2000, he fully believed that Malexapril would behave as Quinnapril behaved, and his experiments on Quinnapril had shown what he did. He thought he could write them the way he did. He was mistaken, and he has said that. But it was not an intent to deceive at that time. He wrote those claims because he truly believed that's how it would operate, and he truly believed that- Doesn't that fly in the face? Listen to my question again. Doesn't that fly in the face of the scientific method? No. What Dr. Sherman noted is he does a lot of his work on paper, and that's what he did before filing that application. So he normally, when he submits something, say to a journal, or when he was in MIT, he normally submitted something as having been done when it hadn't? No. What he would do, I suspect, and he wasn't asked this question, he would work it out on paper, and then if he felt he had to experiment to prove it, he would do it. In this case, because he had done the Quinnapril experiments, and he expected Malexapril to behave in the same way, and there was no testimony that it wouldn't. In fact, a lot of the patents that are cited as prior art only covered Quinnapril, and the argument is made, well, it's prior art for Malexapril as well. Well, even if he's right, that he can work this out on paper, and he thinks it's going to behave the same way, doesn't he have an obligation to say, based on my other testing, this is the result I expect from this, instead of saying, this is the result I got from this? I mean, that just seems very disingenuous to me. Well, I think hindsight is always a wonderful tool, and I'm sure if someone had told Dr. Sherman... Right, but he's not a new scientist. Your briefs and everything suggest he's done this many, many times. Is this his practice in every other case? In 2000, he thought it was okay to do it the way he did. Even though the manual in 2000 had that express prohibition. But there's no evidence Dr. Sherman had the manual. Dr. Sherman was not a patent lawyer. Dr. Sherman is just that, he's a PhD, and that's what he did. He wrote it, and as he said, he thought it was okay. He's not a patent lawyer, but he's been involved in much litigation, and the evidence in the case was that he was directing the litigation, and he was directing the hand of his lawyers. There are cases when Dr. Sherman does take an active role in litigation. In this case, in writing the patent application, once he drafted the application, as he testified, he turned it over to Mr. Hughes. The chemistry here is acid-based chemistry, correct? It is acid-based chemistry. It seems to me that all the patent does is presume a reaction that goes to completion. No, it does more than that. In fact, what the patent does, and it talks about acid-based reactions when it discusses the prior art. When you look at the specification, and he talks about the 450 patent, he noted that there could well be, following the 450 patent, an acid-based reaction. What is the heart of this patent is something different. What is the heart of this patent is changing in a wet granulation the moxipryl-maloxypryl hydrochloride to maloxypryl magnesium, because Dr. Sherman believed it would be more stable. All the prior art at the time indicated you wanted to keep the maloxypryl hydrochloride. That's what the 450 indicated. That's why you use stabilizers in the 450 to preserve maloxypryl hydrochloride. It's why the examiner, after she reviewed all of the prior art, noted that there was in the prior art discussion of a reaction. But what made this invention different was the changing of the molexypryl hydrochloride purposely to 80% molexypryl magnesium. But he knew, at a point in time, he knew that Univask was an example of a product that reacted. Yes, and what he said in, again, the... He had represented to the PTO that that was not true, that it was the exact opposite, that the ingredients were merely combined. No, what he represented, if I may, what he represented was that the prior art, and I think the first thing he cites to, and he always cites to, was the monograph of molexypryl. And the monograph of molexypryl says very specifically on the monograph, if I may find the monograph, it talks about the tablets containing molexypryl hydrochloride. And he gave that monograph to the patent office to review. So the molexypryl monograph, which is at A12192, was what was known in the prior art about Univask. It is what was given to the examiner. What it says on page 12192A, 12192, is very specific. Univask is supplied as scored-coated tablets containing 7.5 milligrams and 15 milligrams of molexypryl hydrochloride for oral administration. In addition to the active ingredient, molexypryl hydrochloride, that's their words, not mine, the tablet core contains the following inactive ingredients, lactose, magnesium oxide, cro-povidone, magnesium stearate, and gelatin. Nowhere does it say that that tablet contains molexypryl magnesium. In fact, the defendants have always denied infringement in this case. Do you dispute that Dr. Sherman knew at some point during the prosecution that the stability of Univask was due to the creation of the magnesium complex? Well, I think that's confusing two different tests. If we look at the first test that we're talking about, which is after Dr. Sherman had filed his patent application, about a year, that's what is the first test, and that's found on A11269, written in Dr. Sherman's handwriting, March 16th, 2001. What he says here, and what I find interesting about the judge's opinion, the judge says that the trial court said that Dr. Sherman was guilty of now remembering that this was based on Quinipro. When you look at the document, the last two sentences on this document, and Dr. Sherman and I will admit, part of his handwriting is illegible, but it can be made out. This just was the case for Quinipro. Remember, by March 16th, 2001, Dr. Sherman had already filed his patent on Quinipro, had done all the lab work on Quinipro, and knew that he was converting Quinipro hydrochloride to Quinipro magnesium. He says on this very document that this is just as was the case for Quinipro, hence it rests to be converted to magnesium salt, just like Quinipro. What he was doing was, he looked at the test results above, which was simply a test of molexiprohydrochloride against the Univast tablet, which everybody knew was stable because it was being commercially sold, and he knew one of the ingredients was the magnesium base, and he said, magnesium oxide, and he says, in the last two sentences on this document, this is just as was the case for Quinipro. That's where he's reaching his conclusion. That's his, I won't say speculation, but firm speculation that that was happening. One does not have to put the inventor's speculation ... You're into your rebuttal time. Oh, I'm sorry. You can use it up if you want, or you can save it. I'll save my rebuttal time. Thank you. Mr. Gaten. Good morning. Thank you, Your Honors. I'm Adam Gaten. I'm here today on behalf of UCB. If I may start with the examples, as we did with Apotex, testimony from Dr. Sherman was that he checked with his patent agent, Hughes, and asked him, is it okay if I write hypothetical examples? And he was told yes. And what he comes up with, as you recognized, is almost anti-hypothetical. I mean, there's more historical description in his telling of these experiments than there often is in the telling of experiments that actually occurred. And the rule in the MPEP is there for reasons that must be obvious in this case, right? In a case in which he's claiming a process, a very specific process, according to him, although claims don't bear that out, that has a very specific result in terms of amount of conversion, and that leaves this very useful stability. If the process was never done, we don't even know if it works, right? Is it your argument that Dr. Sherman had to have known during prosecution that the components of Univask were actually combined and reacted? Well, according to him, that's the only way you get to molexicrylmagnesium. And if we go back to the handwritten notes that Mr. Breisbach was just describing, he says in 2001, the day he files this patent application in the United States, that Univask, or he believes anyway, a firm belief, as Mr. Breisbach put it, that Univask exists as the magnesium salt, right? And then a month later, in April, still at the very beginning of the prosecution, he has his scientists at Apotex perform some additional tests, and they come to the same conclusion, right? And he testified at trial that he believed that conclusion. So by April of 2001, he understands or believes well enough, right, to his satisfaction that Univask exists as the magnesium salt. For the next three years prosecuting this patent, he told PTO over and over and over again, and we counted it something like eight or nine times, if you include Dr. Lipp's declaration, that Univask is a result of a process that is unreacted but combined. And on at least one occasion, and maybe more. But is it possible to have a process that's combined and unreacted and yet achieve the stability that the patent was claiming? That's possible, I suppose. I don't think there was any evidence of that effect. And in fact, if you look at the GU article, which is one of the two or three pieces of prior art, GU's conclusion is that if you just combine these things in a dry powder or dry granulation, you're not going to get stability. That's my point. So it had to have been reactive in order to have the magnesium complex. That's right. And Dr. Sherman testified that he knew of no other way to get it stable other than this reaction, which produces the magnesium salt, which makes it stable. And again, by April 2001, he was satisfied enough with that, not only because he suspected it, which is no surprise given the history in the analog cases. But he had test proof of it that was satisfactory to him. And he kept telling the PTO the opposite. And that is, in our view... How do you respond to your opponent's arguments in their brief that Dr. Sherman had a suspicion but no clear knowledge of the process used for the univax tablets? Well, the response is it was his view the only way to get stability was to get the magnesium salt. And the only way to get the magnesium salt was to achieve this conversion reaction. But that's his, I mean, obviously well-founded speculation, but yet it's speculation. Does he have an obligation to report this must be the way that your company is doing this to the PTO, even if he doesn't know for sure? Well, I have two responses to that. First is he has at least an obligation not to continue to tell the PTO the opposite, when he knows to his own satisfaction that what he's telling them is not true. And... Can I back you up? I understand where you're going with that. Can I back you up a little bit? Is there anything in the 450 patent or in the monograph that describes the product that suggests it's reacted, not combined? Well, the suggestion, as it did in the analog case, comes from the fact that these ingredients are wet granulated, right? And if they're wet granulated, as Dr. Sherman... Where in either of those discussions does it say it's wet granulated? All the examples in the 450 are of wet granulation, and it describes wet granulation as the preferred method. You also get that in Hu, whose conclusion is that wet granulation is the only way to get stability. And then he postulates a couple of explanations for why wet granulation would get you there, right? Like the magnesium salt, and there was testimony either from SEMA or Sherman or both that that's exactly the reaction he's talking about. Isn't the core of your argument there that if one has a strong suspicion that an affirmative representation is false, that there's an obligation at that point to tell the PTO, even if it's just, as he said, strong suspicion or belief? Well, in this case, you have not only strong suspicion, right? He went into it with a strong suspicion, and then he did tests to confirm the suspicion. So I think the argument is, when you know that univasc is the magnesium salt, and that you only get there through reaction and conversion, you may not tell the PTO the opposite. Well, stand back and say, I'm not asking about the specific, I'm asking about a policy. That is, if you've said something affirmative, anything affirmative to the PTO, and then you at some point strongly suspect that what you said is false, you have some obligation to inform the PTO. I think arguably, yes. I mean, at some point, you're getting into an almost epistemological question about what knowledge is, right? When does suspicion become belief? And I think he testified that it was a firm belief, and the district court found as a matter of fact that he knew, right? So as to your policy question, I don't know. I don't know where the line would be, but I think there certainly comes a point where, you know, suspicion is knowledge sufficient for purposes of the duty of candor. Is it your argument that if you know that the components of Univasc are reacted, that then you know what the process is? Well, you know what the process is because the process was effectively disclosed to the world in the 450 patent and in the ingredients in the monograph, which is all, for example, going back one more time to the enalapril case, Dr. Sherman needed to understand that this very basic, simple acid-base reaction was taking place. Does that answer your question? Yes, sir. So I see I've gotten myself into inequitable conduct, and so that's our first ground, right? These were affirmative misrepresentations. They were repeated, they were bolded and underlined, he knew the opposite was true. They were clearly material actability, but poor material. Is it your argument that this was egregious under the Theracense standard? It was egregious under the Theracense standard, especially when you consider... Where is the false declaration, written declaration? Are you saying it was a statement by Hughes? Well, Theracense does not, in fact, very specifically, does not require only a false declaration for egregious conduct. The egregious conduct here was a patent... That's the example that we gave of what constitutes egregious conduct. You did, that's right. Show me something similar in this case to that. Well, Sherman's statements under Roeth in the initial... Other than the statements. Well, I mean, there's a whole list of additional deceptive conduct that the court went through, I think described it as non-exhaustive. There was his use of the past tense in the examples. There were the misrepresentation itself about Univask. There were misrepresentations of fact about Gu and the 450 patent. He withheld the 560 PCT, which was clearly but for material, and that withholding in our view is a separate, independently sufficient basis to find inequitable conduct. He shielded his expert whose hiring he directed from the results of his tests, from his suspicion from the 560 patent, if he had it, which he did. He hired a separate firm to prosecute this parallel application. Let me ask you a related question because I'd like for your opponent to answer this. And we didn't ask him in this direct, but do we have to reject all of the district court's findings of fact if we're going to reverse in this case? Yes, and you'd have to find they were all clear error as well to get there. These were very specific findings of fact, and in my view, that that opinion is so meticulously supported by sites to the record that I don't believe any of the findings of fact, significant, minor, are reversible for clear error because they're all . . . You will address judicial estoppel or latches? And before you do, let me just throw in . . . Go ahead. If we go with you on inequitable conduct, do we have to go any further? That would effectively, if the patent is unenforceable, that would effectively end it. And before I turn to judicial estoppel, if I may, I just want to be clear that we have at least three separate . . . That's not the case with judicial estoppel. We still would have to make a determination on inequitable conduct. Well, if Aphitex is judicially estopped from suing UCB . . . Because that only estops this litigation. That's right. It leaves the patent out there. It leaves the patent out there. That's right. Okay. So, judicial estoppel is sort of a, you know, all the facts required for subsumed, largely inequitable conduct facts that he made these representations to the PTO that the univast process, whatever it is, is different from what he's invented. That's how we got the benefit of the 556 patent in the first place. And then he turns around and comes into Judge Middlebrooks' courtroom and says, now I'm suing UCB for infringement because, as it turns out, the opposite is true. Every element you need for judicial estoppel is present there. You have not only an inconsistency, but as Judge Middlebrooks found, an unavoidable inconsistency. I mean, these are opposite positions. And he was aware of the facts when he took the position to gain the benefit in the PTO. And when he reversed the yield and took the position required to maintain his lawsuit. You know, it's both elements of judicial estoppel. Can I ask you a hypothetical? Can we put aside all these alleged misrepresentations and the like, and just assume he actually really believed what he was saying, that univast really, he really did think it was combined, not reacted. And so he did legitimately get a patent by arguing that that product is not the same as his process. And then it turns out that it is the same process. Would judicial estoppel still apply there without any kind of affirmative misconduct or misrepresentation? I think it would, because he's taken inconsistent positions. No, he's taken a different legal theory. He's got a different legal argument under that scenario, doesn't he? That hypothetical. Well, if he obtains the benefit in the patent office of the patent by arguing that univast is a different process, then that's position X. And then if he turns around and brings suit because of position not X, then those are inconsistent positions. And maybe he had been mistaken, but he gets the benefit in both places, and that's the kind of thing that judicial estoppel was meant to avoid. And disclaimer is sort of similar, right? I mean, disclaimer doesn't even require the second step of an inconsistent opposite position in the district court. He's spent three-plus years of prosecution telling the PTO and then ultimately the public that whenever a univast process is, my process is different. I've got something new. So what is it that's pending below? Did the court—I understand the court bifurcated the case. What is it that's left? Well, there's nothing left on the basis of his present decision, right? I mean, the patent is unenforceable. Apotex is judicially estopped. There's disclaimer. If those positions are affirmed, then there's nothing to go back. Have you argued exceptional case? Is that an issue that's important? We started the briefing, and that was a state-pending resolution of the appeal. And it was Judge Middlebrooks himself who suggested at the end of his opinion that this was an exceptional case, which, if I may say so, I think is further indication that he was deeply offended by the sequence of events that led to this lawsuit. Any questions? No? All right. Thank you. Thank you very much. If I may, Dr. Sherman's patent covers more than just white granulation, and the examiner understood that, and I'll get to where the examiner talks about that. It's 80% conversion to molecular magnesium. And let me tell you that UCB has always insisted— Does that really matter? I mean, because what we're talking about is his representations over and over again that the other patent didn't use reaction. It was combined. And it doesn't matter what percentage you get. If those are false, those are false. And they conform the basis for an inequitable conduct finding. Well, they're not if they're not material, and the examiner doesn't follow them. And that's what happened in this case when you look at the file history. If you go back to the file history—and before I get there, let me just say that in their request to admit, filed in 2012, plaintiff's—defendant's UCB said, admitted that UCB takes measures to maintain the confidentiality of the manufacturing process for Univasc. Admitted that—and this is on A10009—admitted that UCB takes measures to maintain the confidentiality of the manufacturing process for Univasc. They kept those processes confidential. That's what their own witness test did. That suppressed and concealed their actual process. Dr. Sherman's patent went to a process for the conversion. And does it make a difference? Yes, because Dr. Sherman, right in his specification on A12064, noted that using the 450 patent, the molecular hydrochloride and the magnesium compound are capable of an acid-base reaction. He talked about it being capable, but he went on to say it is difficult to control the process to as to completely avoid an acid-base reaction in the making of the composition. Again, UCB in its monograph said, we're selling molecular hydrochloride. Maybe there is some conversion, but it's not enough for them to change that as what it was they were selling. And that is what Dr. Sherman gave to the patent office. And every one of the representations about combined and not reacted, always cites to the monograph, because the monograph never says, we're selling you molexicromagnesium. What is it that USB maintained confidential? That it was, that the process involved combining and reaction, or the percentage, whether it meant the 80%? It's the process to make their UCB tablet, which if it contains over 80%, that's the process. They're step-by-step process, because it takes more than just putting in water and there's a reaction. You have to be able to control the reaction, which is what Dr. Sherman's patent went to, controlling the reaction. Are you saying now that his representations to the PTO, or that the UNIVAC system may have had a reaction, but they weren't controlled and didn't get the 80%? I don't see anything in the record that says that. Every one of his representations, Mr. Hughes made the representations. Dr. Sherman, in his initial application, in the specification, talks about here's what they say in their tablet, that it's still molexicryl hydrochloride. And when, this was part of the record. In reality, don't you think it's important for him to tell the PTO that he thinks that that's probably not right? That this is what he thinks is happening? So he doesn't continue to suggest that his process is different when he knows it's not? He doesn't know their process. That's the point. They kept their process confidential. What is the result of their process, though? I mean, he did test. None of it showed 80%. What he knew was they had a stage. It still showed that it was reacted. It showed that there was a reaction, which is what the examiner found. Because the examiner found, and if the court looks at the file history, and I think this is significant. What did the examiner say is the primary reason for final allowance of the PET? And what the examiner found is that none of the prior art showed conversion, even though there was reaction. None of the prior art showed conversion to 80%. Is that my question? I'm sorry. I misunderstood it. What did the examiner say was the primary reason for allowance? She said the primary reason for allowance, and I'm turning to it right now. And she says this on page A12399. The primary reason for allowance is that the prior art does not disclose or fairly suggest a process of making a pharmaceutical composition containing molexipro magnesium comprising the step of reacting the molexipro or an acid addition salt thereof with an alkaline magnesium compound so as to convert. If you're going to emphasize the so as to convert part, how come you don't emphasize the reacting part? Because the examiner understood the prior art showed reaction. If the court goes back to in the file history, page A12389, this is the office advisory action of the examiner after the lip declaration, after every statement has been made. She says, continuation of five, does not place the application in conditions for allowance because, firstly, the rejected claims do not recite a percent conversion. So the degree of conversion done by the prior art reads on the claim. So she understood there was some conversion in the prior art but not the percentage of conversion. Counselor, you're out of time. You can give us one sentence in conclusion if you want, but otherwise you're out of time. My conclusion is this is not an equitable conduct and it's not judicial estoppel because they kept their process suppressed and concealed. Sherman had suspicions but he did not know what their process was and none of the tests he conducted in 2001 show what the process was. Thank you. Thank you very much.